IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-1-D

| | | |
|---|---|---|
| JOHN R. LAWS, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| U.S. BANK NATIONAL | ) | |
| ASSOCIATION, TRUSTEE, and | ) | |
| NATIONSTAR MORTGAGE, L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

On December 19, 2014, John R. Laws, II ("Laws" or "plaintiff"), filed a suit against U.S.

Bank National Association ("U.S. Bank") and Nationstar Mortgage, LLC, ("Nationstar")

(collectively, "defendants"), in Cumberland County Superior Court [D.E. 1-1]. On January 2, 2015,

defendants removed the action to this court [D.E. 1]. On January 30, 2015, defendants moved to

dismiss Laws's complaint [D.E. 13]. On June 3, 2015, the court granted defendants' motion to

dismiss Laws's complaint and granted Laws leave to file an amended complaint [D.E. 24]. On June

19, 2015, Laws filed an amended complaint [D.E. 25]. On July 20, 2015, defendants answered

Laws's amended complaint [D.E. 28, 29].

On November 21, 2016, defendants moved for summary judgment [D.E. 36] and filed a

statement of material facts [D.E. 37], a memorandum in support [D.E. 39], and an appendix to the

memorandum in support [D.E. 38]. On January 10, 2017, Laws responded to defendants' motion

[D.E. 45] and filed a statement of material facts [D.E. 43] and an appendix with additional

documents [D.E. 44]. As explained below, the court grants in part and denies in part defendants'

motion for summary judgment.

I.

On June 6, 2005, Laws executed a $205,200.00 promissory note ("the Note") in favor of Argent Mortgage Company, LLC. [D.E. 44-1] 2–3. At all relevant times, MLMI Trust, Certificate Series 2007-SD1, owned the loan, and U.S. Bank is the current trustee. [D.E. 37] ¶ 8; [D.E. 43] ¶ 8. The Note required Laws to make monthly payments of $1,455.93, which the holder of the Note was to apply first to interest on the Note, second to the Note's principal, and third to escrow fees. [D.E. 44-1] 2, 7. The holder of the Note also was allowed to assess "late charges" and to return any payment that was "insufficient to bring the Loan current." Id. at 7. The Note allowed Laws to make advance payments, which after prepayment fees would be applied to the Note's principal. Id. A deed of trust on property located at 6911 Southstaff Road, Fayetteville, NC, ("the Deed of Trust") secured the Note. Id. at 5–16. The Deed of Trust provided that the holder of the Note "or its agents may make reasonable entries upon and inspection of the property." Id. at 9.

Laws made timely monthly payments as required by the Note. [D.E. 44-13] 26–27. In 2010, Bank of America, N.A., ("BANA") or its predecessor began servicing Laws's loan. [D.E. 37] ¶ 7; [D.E. 43] ¶ 7. U.S. Bank is the trustee of Laws's loan for MLMI. [D.E. 44-3] 7; [D.E. 37] ¶ 8; [D.E. 43] ¶ 8.

On November 18, 2011, Laws sued BANA, alleging servicing errors and other misconduct arising from BANA's servicing of his loan. [D.E. 37-5]. Essentially, Laws alleged that BANA had erroneously changed the name on his loan, refused to accept the payments Laws sent in his own name, and therefore had injured Laws by treating his loan as though it were in default.

In 2013, BANA and Nationstar contracted to transfer the servicing of Laws's loan to Nationstar on July 1, 2013. [D.E. 37-6] 14; [D.E. 37] ¶ 10; [D.E. 43] ¶ 10. BANA credited Laws for a $1,856.11 payment made on June 12, 2013, which was the last of Laws's payments BANA

credited. [D.E. 37-1] 37; [D.E. 37] ¶¶ 11–12; [D.E. 43] ¶¶ 11–12. When the loan was transferred to Nationstar for servicing, the account statement reflected a $41,187.98 delinquency, even though Laws had sent a full payment each month. [D.E. 37-1] 38–40. In June 2013, during a settlement conference with BANA, Laws learned for the first time that BANA planned to transfer servicing of his loan to Nationstar on July 1, 2013. [D.E. 44-13] 59.

In a letter dated June 10, 2013, BANA wrote to Laws providing information regarding the pending transfer of service, including a statement that any Qualified Written Request ("QWR") regarding BANA's loan servicing be sent to a given address. [D.E. 44-3] 1–4. In a letter dated June 25, 2013, Nationstar wrote to Laws regarding the impending transfer of loan servicing to Nationstar. [D.E. 37-6] 14. In a letter dated June 28, 2013, Nationstar again informed Laws of the impending transfer of loan servicing. Id. at 15.

In a letter dated July 12, 2013, Nationstar sent Laws a "Notice of Servicing Transfer," a welcome letter, and "Important Account Information." [D.E. 44-3] 5–8. The communication stated that $39,385.98 was currently due on the loan. Id. at 5. In a section titled "CONTACT INFORMATION" the communication indicated that any QWR should be sent to "350 Highland Drive, Lewisville, TX 75067." Id. at 6. An asterisk directed the reader to a footnote which stated "PURSUANT TO RESPA, A 'QUALIFIED WRITTEN REQUEST' REGARDING THE SERVICING OF YOUR LOAN MUST BE SENT TO THIS ADDRESS: Nationstar Mortgage, 350 Highland Drive, Lewisville, TX 75067, Attn: Customer Relations Officer," and went on to define what letters qualify as QWRs. Id. The July 12, 2013 communication also stated "[u]nless you dispute the validity of this debt, or any portion thereof, within thirty (30) days after receipt of this notice, the debt will be assumed to be valid by Nationstar" and "[i]f you notify Nationstar in writing within this thirty (30) day period that the debt, or any portion thereof, is disputed, Nationstar will

3

obtain verification and such verification will be mailed to you." Id. at 7. From July 2013 through March 2014, Laws paid Nationstar in monthly amounts of $1,856.11, which Nationstar accepted and applied to Laws's account for the months of August 2011 through May 2012. See [D.E. 37-1] 45–47; [D.E. 37] ¶ 17; [D.E. 43] ¶ 17.

In a letter to Laws dated July 22, 2013, Nationstar sent a payoff quote stating that Laws owed $187,675.29 in unpaid principal, $27,501.50 in unpaid interest, $795 in unpaid fees and charges, and $4,217.36 in unpaid escrow expenses for a total of $220,189.15 owed. [D.E. 37-6] 22–23. The letter also stated that payoff funds sent by mail should be sent to:

Nationstar Mortgage LLC
Attn: Payoff Processing
350 Highland Drive
Lewisville, TX 75067[.]

Id. at 22.

On August 16, 2013, Laws's attorney sent a letter to:

Nationstar Mortgage, LLC
350 Highland Drive
Louisville, TX 75067
ATTN: Payoff Processing

stating that the $27,501.50 of interest was incorrect because "[w]hen [Nationstar] purchased this mortgage, this mortgage had been in litigation for approximately 2 ½ years," and that the information regarding Laws's missed payments was "completely false and incorrect." [D.E. 44-4]. The letter described the basis for Laws's complaint against BANA—that Laws had been making timely payments but BANA had improperly refused to accept them—and that the case against BANA had been settled, demanded that Nationstar not report Laws's outstanding debt to credit reporting agencies, and expressed Laws's expectation that Nationstar would reply within five days. Id. at 2–3.

On August 21, 2013, Nationstar's internal records show that it updated the mailing address on file from Laws's address to his attorney's address. [D.E. 37-8] 4. On August 22, 2013, Nationstar sent Laws's attorney a letter that was essentially identical to the July 22, 2013 letter, except that it stated that Laws owed $187,415.79 in unpaid principal, $27,463.57 in unpaid interest, and $3,817.18 in unpaid escrow expenses for a total of $219,491.54 owed. [D.E. 44-3] 9–10.

In a letter dated August 23, 2013, Nationstar sent to Laws's attorney an acknowledgment of Laws's August 16, 2013 letter and stated that Nationstar would investigate the matter and that "[i]n accordance with the Real Estate Settlement Procedures Act (RESPA), a response will be provided within 30 business days." [D.E. 44-4] 5.

On September 19, 2013, Laws and BANA signed an agreement settling the November 18, 2011 suit ("the Settlement Agreement"). [D.E. 44-2]. The settlement provided that BANA (identified in the Settlement Agreement as "Defendant") would pay Laws $250,000.00 plus mediator's fees, reinstate Laws's credit-card limits, and report Laws's loan payments to credit reporting agencies as current through June 30, 2013. Id. at 3. In exchange, Laws (identified in the Settlement Agreement as "Plaintiff") would dismiss the November 18, 2011 suit against BANA and release BANA from liability for acts relating to the November 18, 2011 suit. Id. at 4. Specifically, the release stated:

> For consideration of the Payment and other covenants contained herein, the receipt and sufficiency of which are hereby expressly acknowledged, Plaintiff(s), for themselves and each of their present, former, and future heirs, executors, administrators, partners, co-obligors, co-guarantors, guarantors, sureties, family members, spouses, attorneys, insurers, agents, representatives, predecessors, successors, assigns, and all those who claim through them or could claim through them unconditionally and irrevocably remise, waive, satisfy, release, acquit, and forever discharge Defendant(s) and each of their present, former, and future parents, predecessors, successors, assigns, assignees, affiliates, divisions, departments, subdivisions, owners, partners, principals, trustees, creditors, shareholders, joint ventures, co-venturers, officers, and directors (whether acting in such capacity or

5

individually), attorneys, vendors, accountants, nominees, agents (alleged, apparent, or actual), representatives, employees, managers, administrators, and each person or entity acting or purporting to act for them or on their behalf, as well as any past, present, or future person or any entity that held or holds any interest in the Loan and the underlying Note or Security Instrument, including, but not limited to, Bank of America Corporation and all of its subsidiaries and affiliates (collectively, "Releasees"), and each of them, respectively, from and against any and all past, present, and future claims, counterclaims, actions, suits, rights, causes of action, lawsuits, set-offs, costs, losses, controversies, agreements, promises and demands, or liabilities, of whatever kind or character, direct or indirect, whether known or unknown or capable of being known, arising at law or in equity, by right of action or otherwise, including, but not limited to, suits, debts, accounts, bills, damages, judgments, executions, warranties, attorney's fees, costs of litigation, expenses, claims, and demands whatsoever that Plaintiffs(s) or their attorneys, agents, representatives, predecessors, successors, and assigns have or may have against the Releasees, for, upon, or by reason of any matter, cause, or thing, whatsoever, in law or equity, including without limitation, the claims made or which could have been made by Plaintiff(s) arising from the origination or servicing of the Loan as well as in any way related to the Property, Note, or Security Instrument, any servicing act or omission thereon as well as any claim or issue which was or could have been brought in the Litigation (collectively, the "Released Matters"). However, nothing in this agreement shall be construed to include a release as to Nationstar Mortgage, LLC or any of its agents, servants and employees with regard to the handling, servicing, or reporting of the Plaintiff's mortgage.

Id. at 4–5. Laws and BANA also

agreed that the Parties may provide a copy of this agreement . . . in any litigation, or negotiations with Nationstar Mortgage LLC or its successors or assigns as relates to any negotiations regarding the mortgage upon [Laws's] property, referenced herein, as relating to any penalties, interest or fees that Nationstar Mortgage LLC may seek to impose upon the plaintiff as a result of the transfer of the servicing of [Laws's] mortgage by [BANA] and any information submitted at the time or contemporaneously with said transfer.

Id. at 5. The Settlement Agreement contained a provision stating that "[t]o the extent that this Agreement keeps the Loan and underlying Note or Security Instrument in force . . . this agreement shall not alter the rights, duties, and obligations of said Loan." Id. at 10. Finally, the Settlement Agreement contained a "Neutral Interpretation" provision, stating that "[t]he Parties shall be deemed to have cooperated in the drafting and preparation of this Agreement. Hence, any construction to

be made of this Agreement shall not be construed against any Party." Id. at 8. Laws set aside "[a]ll of" the $250,000.00 for the purposes of paying the uncredited loan payments. [D.E. 37-2] 56–58.

In a letter dated October 1, 2013, Nationstar wrote to Laws's attorney that Nationstar had received the letter dated August 16, 2013,[1] and that Nationstar was "still in the process of reviewing all the concerns addressed in the letter. A resolution will be sent as soon as it is available." [D.E. 44-4] 6.

Laws lived on the property secured by the Note, which was located in a gated community. [D.E. 44-17] ¶¶ 2–5. If a visitor requested entrance to the community, and that visitor had not already been placed on a list of approved visitors, the community's security staff would contact the homeowner to ask if the visitor should be allowed to enter. Id. ¶¶ 4–6. On October 22, 2013, Nationstar completed a property inspection of Laws's property. [D.E. 44-11] 6. On November 12, 2013, Nationstar again inspected Laws's property. Id. Beginning on May 6, 2016, Nationstar's agents made "numerous attempts" to enter the community to inspect Laws's property, including attempting twice in the same day. [D.E. 44-17] ¶¶ 8–12. "Laws [was] contacted each time," presumably by telephone, "to determine if such persons [were] authorized to enter." Id. ¶ 12. In total, Nationstar charged Laws for 33 property inspections over 36 months.

In a letter dated April 28, 2014, Nationstar wrote to Laws's attorney asserting that Laws had "not made payments on [his] loan since" June 1, 2012, demanding payment of $39,907.55, and threatening foreclosure. [D.E. 44-7] 2–3. In a letter dated May 19, 2014, Laws responded to Nationstar, stated that Nationstar had not responded to the August 16, 2013 letter, offered to provide

---

[1] The letter refers to a letter from Laws dated "August 19, 2013." The record does not contain a letter sent by Laws to Nationstar dated August 19, 2013. Nationstar's October 1, 2013 letter apparently refers to Laws's attorney's letter dated August 16, 2013.

additional information to assist in Nationstar's investigation, cited RESPA, and requested a resolution to the dispute. [D.E. 44-5] 2–3. In a letter dated May 29, 2014, Nationstar responded, asserting that Nationstar had reviewed Laws's dispute and found that no error had occurred, that the payment history was correct, that Nationstar would continue to report Laws's loan to credit reporting agencies as delinquent, and that the fees, advances, and interest would not be waived. Id. at 7–8. From May 2014 through December 2014, Nationstar declined to accept Laws's monthly payments and returned each month's payment check to Laws's attorney. [D.E. 37] ¶ 19; [D.E. 43] ¶ 19. In a letter dated June 20, 2014, Nationstar again wrote to Laws's attorney stating that Laws was delinquent on his loan and threatening foreclosure. [D.E. 37-6] 52–54.

In a letter dated September 25, 2014, Laws's attorney wrote to Nationstar requesting documents and information regarding Laws's loan and Nationstar's delinquency claim. Id. at 72. In a letter dated October 6, 2014, Nationstar responded to Laws's attorney, stating that it hoped to provide a response by October 10, 2014. Id. at 74. In a letter dated October 8, 2014, Nationstar responded to Laws's attorney but did not provide any documents or information regarding Laws's loan or Nationstar's delinquency claim. [D.E. 37-1] 60–62. On December 9, 2014, Nationstar sent Laws a Notice of Hearing on Foreclosure of Deed of Trust for Laws's property. [D.E. 37-6] 90–92.

On December 19, 2014, Laws filed this action against defendants in Cumberland County Superior Court [D.E. 1-1]. On January 2, 2015, defendants removed the action to this court [D.E. 1]. On June 19, 2015, Laws filed an amended complaint, alleging breach of contract, breach of the covenant of good faith and fair dealing, violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605, and violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 [D.E. 25]. On July 20, 2015, defendants answered Laws's amended complaint [D.E. 28, 29].

On November 21, 2016, defendants moved for summary judgment [D.E. 36] and filed a statement of material facts [D.E. 37], a memorandum in support [D.E. 39], and an appendix to the memorandum in support [D.E. 38]. On January 10, 2017, Laws responded in opposition to defendants' motion [D.E. 45] and filed a statement of material facts [D.E. 43] and an appendix with additional documents [D.E. 44].

## II.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of a genuine dispute of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. Matsushita, 475 U.S. at 587–88.

Laws alleges that defendants (1) breached a contract with Laws; (2) breached the covenant of good faith and fair dealing in that contract; (3) violated RESPA by failing to properly respond to QWRs; and (4) violated the FDCPA.

A.

As for Laws's breach-of-contract claim, Laws contends that defendants breached the contract by: (1) failing "to accept payments from [Laws]," (2) failing "to apply the payments they received from [Laws]," (3) "[a]dopt[ing] and ratif[ying] the actions of the predecessor servicer by treating the loan as if it were in default," (3) "ma[king] charges of fees and interest on the loan even though [Laws] had made all of the payments as he was instructed to do," (4) instituting "a wrongful foreclosure action," (5) "[f]alsely report[ing] that [Laws's] loan was not being properly paid," (6) "[f]ail[ing] to give [Laws] proper information concerning the payment," (7) "[f]ail[ing] to properly credit overage amounts to the principal of [Laws's] indebtedness," (8) [f]ail[ing] to furnish escrow statements to [Laws]," and (9) "[f]ail[ing] to properly or promptly respond to [Laws's] Qualified Written Requests concerning the account." Am. Compl. [D.E. 25] ¶ 70. Defendants respond that the Settlement Agreement releases them from liability.[2]

To prove breach of contract under North Carolina law, a plaintiff must prove (1) the existence of a valid contract and (2) breach of the terms of the contract. See McLamb v. T.P. Inc., 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005), disc. rev. denied, 360 N.C. 290, 627 S.E.2d 621 (2006); Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); Jackson v. Carolina

---

[2] As for contentions (5) and (9), defendants have argued, and Laws has not contested, that the record contains no basis for defendants' contractual obligation to do anything with respect to credit reporting agencies or defendants' contractual obligation to respond to QWRs within any particular time. See [D.E. 39] 10; [D.E. 45]. Therefore, the court grants defendants' motion for summary judgment as to those contentions. See Matsushita Elec. Indus. Co., 475 U.S. at 587.

Hardwood Co., 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995). The parties agree that the relevant contract is contained in the Note and the Deed of Trust and that the contract is valid.

When interpreting a contract, the court must "ascertain the intention of the parties at the time the contract was executed." Comput. Sales Int'l, Inc. v. Forsyth Mem'l Hosp., Inc., 112 N.C. App. 633, 634, 436 S.E.2d 263, 264 (1993); see State v. Philip Morris USA Inc., 363 N.C. 623, 631, 685 S.E.2d 85, 90 (2009). "A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C., 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008); see Metcalf v. Black Dog Realty, LLC, 200 N.C. App. 619, 633, 684 S.E.2d 709, 719 (2009); Glover v. First Union Nat'l Bank of N.C., 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993). If the court finds the contract ambiguous, however, "interpretation of the contract is for the jury." Schenkel, 362 N.C. at 273, 658 S.E.2d at 921; see Handex of the Carolinas, Inc. v. Cty. of Haywood, 168 N.C. App. 1, 16, 607 S.E.2d 25, 34 (2005); Comput. Sales Int'l, Inc., 112 N.C. App. at 634, 436 S.E.2d at 264. A contract is ambiguous when "either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Schenkel, 362 N.C. at 273, 658 S.E.2d at 921; see Glover, 109 N.C. App. at 456, 428 S.E.2d at 209 ("An ambiguity exists where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties."). Contractual releases must be supported by consideration. See, e.g., Lenoir Mem'l Hosp., Inc. v. Stancil, 263 N.C. 630, 633–34, 139 S.E.2d 901, 903 (1965); All In One Maint. Serv. v. Beech Mountain Constr. Co., 70 N.C. App. 49, 55, 318 S.E.2d 856, 860 (1984).

The Settlement Agreement's release provision includes an "unconditional[]" release of "any past, present, or future person or any entity that held or holds any interest in the Loan and the underlying Note or Security Instrument" for any liability "arising from the origination or servicing

11

of the Loan as well as in any way related to the Property, Note, or Security Instrument, any servicing act or omission thereon as well as any claim or issue which was or could have been brought in" Laws's November18, 2011 suit. [D.E. 44-2] 4.[3] The release covered BANA's "trustees . . . agents (alleged, apparent, or actual), . . . as well as any past, present or future person or any entity that held or holds any interest in the loan and the underlying Note or Security Instrument." Id. at 4. That release provision is qualified, however, in a carve-out provision stating that "nothing in this agreement shall be construed to include a release as to Nationstar Mortgage, LLC or any of its agents, servants and employees with regard to the handling, servicing, or reporting of [Laws's] mortgage." Id. at 5.

U.S. Bank, as the trustee of the loan, was an "entity" that "held or holds [an] interest in the loan and the underlying Note or Security Instrument" covered by the release. Because U.S. Bank is not Nationstar or one of "its agents, servants, [or] employees," U.S. Bank does not fall within the carve-out provision. Therefore, Laws has "unconditionally" released U.S. Bank from liability for "any and all past, present, and future claims . . . arising from the origination or servicing of the Loan as well as in any way related to the Property, Note, or Security Instrument, any servicing act or omission thereon as well as any claim or issue which was or could have been brought" in the November 18, 2011 suit. The scope of that release covers all of Laws's claims in this action. Thus, the court grants defendants' motion for summary judgment as to U.S. Bank for all claims.

---

[3] In North Carolina, ambiguous contracts are generally interpreted against the drafting party. See Wood-Hopkins Contracting Co. v. N.C. State Ports Auth., 284 N.C. 732, 738, 202 S.E.2d 473, 476 (1974). The Settlement Agreement, however, contained a "Neutral Interpretation" provision providing that "any construction to be made of this Agreement shall not be construed against any Party." [D.E. 44-2] 8.

12

Nationstar has not been released from liability if this lawsuit relates to the handling, servicing, or reporting of Laws's mortgage because Nationstar is explicitly excepted from the release by the carve-out provision.[4] This lawsuit does relate to Nationstar's handling, servicing, and reporting of Laws's mortgage, and therefore Nationstar is not covered by the release.

In opposition to this conclusion, Nationstar cites Silvers v. Horace Mann Insurance Company, 324 N.C. 289, 296 n.4, 378 S.E.2d 21, 26 n.4 (1989), and argues that the release provision alone, but not the carve-out to the release provision, should apply to Nationstar. In Silvers, the plaintiff's son was killed in a motor vehicle accident by a driver whose liability insurance was limited to $25,000.00. Id. at 290–91, 378 S.E.2d at 23. The plaintiff settled a wrongful-death action with the driver's insurer in a settlement agreement, and that settlement agreement was incorporated into a consent judgment stating that "this consent judgment shall not release nor relinquish any rights that the Plaintiff's intestate has or might have against [the plaintiff's underinsured motorist insurer (the 'UIMI')] under any underinsured liability coverage." Id. at 291, 378 S.E.2d at 23. The court held that the plaintiff's contract with the UIMI was ambiguous concerning whether the plaintiff was required to settle a claim up to the defendant's policy limit before seeking recovery from the UIMI or whether settling a claim terminated the UIMI's liability, and construed the contract in favor of the plaintiff because the UIMI had drafted the contract. Id. at 294–96, 378 S.E.2d at 25–26. The court also observed that the reservation of rights against the UIMI in the consent judgment was insignificant because consent judgments are interpreted according to contract principles, third parties

_____

[4] Viewing the evidence in the light most favorable to Laws, it appears that the parties to the Settlement Agreement anticipated the existence of this very lawsuit when drafting the carve-out of the Settlement Agreement's release provision. Nationstar sent Laws a letter on July 12, 2013, two months before the Settlement Agreement was signed, stating that Laws owed $39,385.98 on the loan. Furthermore, the Settlement Agreement included specific provisions discussing potential negotiations and lawsuits between Laws and Nationstar.

13

must assent to a contract in order to be bound by that contract, and the UIMI was not a party to the consent judgment and never assented to the reservation of rights against it. Id. at 296 n.4, 378 S.E.2d 21, 26 n.4. That is, had there not been a sufficient basis for the UIMI's liability in the parties' insurance contract, the consent judgment could not have provided one. See id.

Silvers does not stand for the proposition that any release worded as a general release with a carve-out renders the carve-out ineffective. Likewise, Silvers does not stand for the proposition that a party may cherrypick from an agreement to invoke terms that release it from liability while ignoring terms that except it from the scope of the release.

Nationstar also argues that the provision of the Settlement Agreement stating that "this Agreement shall not alter the rights, duties, and obligations of said Loan" comports with reading the Settlement Agreement to not carve out Laws's claims. Essentially, Nationstar contends that even if Laws properly mailed his monthly payments to BANA, those checks were returned, and the money owed on the loan was never transferred from Laws's account to BANA. Nationstar then argues that the continuing rights, duties, and obligations of the loan included the months of unaccepted payments.

Nationstar's argument concerns the validity of Laws's contract claim, and does not affect the court's analysis of the unambiguous carve-out in the Settlement Agreement's release provision. Viewing the facts in the light most favorable to Laws, Laws properly mailed each of his monthly mortgage payments and thereby performed his obligation under the Note, even if BANA or Nationstar failed to cash the checks. Thus, a jury would have a legally sufficient basis to find that the "rights, duties, and obligations" under the Note would not include any amounts other than Laws's continued monthly payments.

14

As for the other alleged breaches of contract by Nationstar, those alleged breaches survive summary judgment. A jury would have a legally sufficient basis to find that Laws had no duty to repay the monthly amounts he had already properly mailed to BANA or Nationstar, but which BANA and Nationstar failed to properly credit. Furthermore, even if Laws had a continuing obligation to pay the uncredited amounts, the Settlement Agreement is sufficiently ambiguous concerning whether it waived Laws's duty to pay the uncredited amounts plus the interest, late fees, and other charges that accumulated due to the failure to credit Laws's payments.

In Nationstar's favor, the Settlement Agreement states that it would not alter the "rights, duties, and obligations" of either party under the loan. Furthermore, Laws's conduct in setting aside money for payment of the uncredited amounts suggests that Laws understood he would remain liable for the uncredited payments, and that the settlement payment was intended to cover the cost of bringing the loan current by paying Nationstar. These indicia of intent are far from clear, however. If the parties understood that Laws's "rights, duties, and obligations" did not include a duty to repay uncredited payments or to pay interest or fees assessed because of BANA's wrongful failure to credit his initial payments, then that provision would not support Nationstar's position. Likewise, Laws may have set the funds aside merely out of an abundance of caution during ongoing litigation.

Other provisions of the Settlement Agreement also manifest ambiguity as to Laws's continued liability for the uncredited payments. The Settlement Agreement required BANA to "electronically notify the major credit reporting agencies to which it furnishes information about the Loan to reflect the payments from March 1, 2010 through June 30, 2013 as current." [D.E. 44-2] 3. Although the Settlement Agreement contained a confidentiality provision, the parties specifically permitted disclosure for the purpose of "describ[ing] the terms and conditions of this lawsuit in any litigation, or negotiations with Nationstar Mortgage LLC or its successors or assigns as relates to any

15

negotiations regarding the mortgage upon [Laws's] property, referenced herein, as relating to any penalties, interest or fees that Nationstar Mortgage LLC may seek to impose upon [Laws] as a result of the transfer of the servicing of [Laws's] mortgage by [BANA] and any information submitted at the time or contemporaneously with said transfer." Id. at 5. Thus, the parties apparently believed the Settlement Agreement could have some effect on the penalties, interest, or fees that Nationstar might seek from Laws.

Although it would be unusual for a sophisticated party like BANA to waive over $40,000 in debt without an express contractual statement—and the court is aware of the Settlement Agreement's provision stating that the Settlement Agreement does not include any "promise, inducement or other agreement not expressly contained" in the Settlement Agreement—it would be equally unusual for BANA to agree in writing to provide inaccurate information to credit reporting agencies. See 15 U.S.C. § 1681s-2(a)(1)(A) ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."). If the Settlement Agreement did not waive Laws's duty to pay the uncredited amounts, and does not presuppose that no such duty exists, then it would require BANA to falsely report to "major credit reporting agencies" that Laws's loan was current when it was not. Here, a genuine issue of material fact exists concerning the parties' intent, and a reasonable jury would have a legally sufficient basis to find that the parties intended the Settlement Agreement to waive Laws's obligation to pay the uncredited amounts. Thus, the court denies defendants' motion for summary judgment on the breach-of-contract claim against Nationstar and grants defendants' motion for summary judgment on that claim as to U.S. Bank.

B.

As for Laws's claim that defendants breached the covenant of good faith and fair dealing, Laws alleges that defendants breached that covenant by (1) failing "to accept payments from [Laws]," (2) failing "[t]o apply the payments [Nationstar] received from [Laws]," (3) "treat[ing] the loan as if it were in default when they knew or should have known that the loan was not in default," (4) "ma[king] charges of fees and interest on the loan when [Laws] had made all of the payments as he was instructed to do," (5) instituting "a foreclosure action against [Laws] and [his] property when [the] loan was not in default," (6) failing "[t]o properly advise [Laws] on the status of the loan," (7) failing "[t]o report accurate and correct information to credit reporting agencies," (8) failing "[t]o give [Laws] proper information concerning the payment," (9) failing "[t]o properly credit overage amounts paid by [Laws] to the principal of [Laws's] indebtedness," (10) failing "[t]o furnish accurate and correct escrow statements to [Laws]," and (11) failing "[t]o properly or promptly respond to [Laws's] Qualified Written Requests concerning the account." Am. Compl. ¶ 85. These are the same claims Laws raised in his breach-of-contract claim. See id. ¶ 7.[5]

Under North Carolina law, every contract contains "an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (quotation omitted). However, where parties have executed a written contract, an action

---

[5] In his memorandum in opposition to defendants' motion for summary judgment, Laws asserts that defendants breached the covenant of good faith and fair dealing by attempting excessive property inspections, charging Laws for those inspections, and claiming that it was investigating Laws's complaints when in fact no investigation was occurring. [D.E. 45] 12–16. These claims are not in Laws's amended complaint, and Laws may not amend his complaint via summary-judgment briefing. See, e.g., Hexion Specialty Chems., Inc. v. Oak-Bark Corp., No. 7:09-CV-105-D, 2011 WL 4527382, at *7–10 (E.D.N.C. Sept. 28, 2011) (unpublished) (collecting cases).

17

for "breach of the covenant of good faith and fair dealing is part and parcel of [a] claim for breach of contract." McKinney v. Nationstar Mortg., LLC, No. 5:15-CV-637-FL, 2016 WL 3659898, at *8 (E.D.N.C. July 1, 2016) (unpublished) (applying North Carolina law); see Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000) (same), aff'd, 18 F. App'x 147 (4th Cir. 2001) (per curiam) (unpublished). Moreover, North Carolina recognizes "a separate claim for breach of an implied covenant of good faith and fair dealing only in limited circumstances involving special relationships between parties, [such as] cases involving contracts for funeral services and insurance" or contracts arising from a fiduciary relationship or something akin to a fiduciary relationship. Ada Liss Grp. (2003) v. Sara Lee Corp., No. 1:06CV610, 2009 WL 3241821, at *13 n.10 (M.D.N.C. Sept. 30, 2009) (unpublished) (quotations omitted), R&R adopted, 2010 WL 3910433, at *14 (M.D.N.C. Apr. 27, 2010) (unpublished); see Richardson v. Bank of Am., N.A., 182 N.C. App. 531, 556–58, 643 S.E. 2d 410, 426–27 (2007); Gant v. NCNB Nat'l Bank of N.C., 94 N.C. App. 198, 199–200, 379 S.E.2d 865, 867 (1989). "Outside such circumstances, actions for breach of good faith fail." Ada Liss Grp. (2003), 2010 WL 3910433, at *14.

Laws's debtor–creditor relationship with defendants is not a special relationship entitling Laws to assert a separate claim for breach of an implied covenant of good faith and fair dealing. See, e.g., Broussard v. Meineke Muffler Shops, Inc., 155 F.3d 331, 347–48 (4th Cir. 1998); Abbington SPE, LLC v. U.S. Bank, N.A., No. 7:16-CV-249-D, 2016 WL 6330389, at *6 (E.D.N.C. Oct. 27, 2016) (unpublished); Ada Liss Grp. (2003), 2010 WL 3910433, at *14; Highland Paving Co. v. First Bank, 227 N.C. App. 36, 43, 742 S.E.2d 287, 292–93 (2013); Branch Banking & Tr. Co. v. Thompson, 107 N.C. App. 53, 60–61, 418 S.E. 2d 694, 699 (1992). Thus, the court grants summary judgment to defendants on this claim.

18

C.

As for Laws's claim that Nationstar violated RESPA, Laws focuses on three letters from Nationstar dated August 16, 2013, May 19, 2014, and September 25, 2014.[6] Under RESPA a "servicer" is defined as "the person responsible for servicing of a loan." 12 U.S.C. § 2605(i)(2). "Servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." Id. § 2605(i)(3). A "qualified written request" ("QWR") is "a written correspondence" that "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." Id. § 2605(e)(1)(B). RESPA does not require any particular mental state for a communication to constitute a QWR, and a person need not intend a letter to be covered by section 2605(e) for that section's protections to apply.

RESPA requires that loan servicers who receive a QWR to, within 30 business days, correct the error and notify the borrower of the correction, or conduct an investigation and "provide the borrower with a written explanation or clarification that includes" (1) the contact information of an employee who can assist the borrower and (2) either "a statement of the reasons for which the servicer believes the account of the borrower is correct" or "information requested by the borrower or an explanation of why the information requested is unavailable." Id. § 2605(e)(2). At the time

---

[6] To the extant Laws seeks to assert a RESPA claim against U.S. Bank, the court grants summary judgment to U.S. Bank. No evidence supports such a claim against U.S. Bank.

19

of the events in this lawsuit, RESPA required a loan servicer to acknowledge receipt of a QWR within 20 business days. 12 U.S.C. § 2605(e)(1)(A) (2011).[7] The loan servicer must conduct an investigation before responding. See Marais v. Chase Home Fin., LLC, 24 F. Supp. 3d 712, 723–24 (S.D. Ohio 2014). A letter need not specifically reference RESPA or any of its provisions to constitute a QWR. A borrower may recover "actual damages" if the loan servicer fails to comply with section 2605(e). 12 U.S.C. § 2605(f)(1)(A).

The August 16, 2013 letter included Laws's account numbers for his BANA and Nationstar accounts, as well as the address of the property covered by the Deed of Trust. The letter stated Laws's belief that Nationstar's payoff statement, showing that Laws owed $27,501.50 in interest, was erroneous because the information that Laws had failed to pay BANA was "completely false and incorrect." Laws's attorney also stated that he "expect[ed] to hear from someone in your office within the next five (5) days." This letter included Laws's name, account numbers, sufficient information to identify his account, and statements of the reasons why Laws believed that the account, specifically the amount of interest owed on the account, was in error. That Laws's attorney stated that he "expect[ed]" a response within 5 days, when Nationstar in fact was required to respond to QWRs within 20 days, does not change the court's analysis. Furthermore, the court rejects defendants' argument that this letter was unrelated to Nationstar's servicing of Laws's loan. See Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed. Reg. 65442-01, 65445 (Dec. 19, 1994) ("The statute encompasses all

---

[7] RESPA has since been amended and now requires a loan servicer to acknowledge receipt of a QWR within five business days, but that change took effect on January 10, 2014. See Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111–203 § 1463(c)(2)-(3) (2010) (transferring the Department of Housing and Urban Development's ("HUD") RESPA regulations to the Consumer Financial Protection Bureau ("CFPB")); 12 C.F.R. § 1024.21 (CFPD adopting HUD's RESPA regulations); Berneike v. CitiMortgage, Inc., 708 F.3d 1141, 1145 n.3 (10th Cir. 2013).

information relating to the servicing of a mortgage loan and does not restrict the matter to questions concerning the transfer of servicing, installment payments, or account balances.").

Nonetheless, the August 16, 2013 letter is not a QWR because Laws's attorney mailed it to the wrong office. A loan servicer may "establish an office to handle borrowers' complaints," and if it properly notifies the borrower of that address, "then the borrower must deliver its request to that office in order for the inquiry to be a" QWR. Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans (Regulation X), 59 Fed. Reg. at 65,445–65,446; see Roth v. CitiMortgage Inc., 756 F.3d 178, 181–82 (2d Cir. 2014); Berneike, 708 F.3d at 1148–48; 24 CFR § 3500.21(e)(1) (effective January 16, 2009 through July 15, 2014); Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg, 34224-01, 34226 (June 16, 2014). A loan servicer may establish an exclusive office address "[b]y notice either included in the Notice of Transfer or separately delivered by first-class mail." 24 C.F.R. § 3500.21(e)(1) (effective January 16, 2009 through July 15, 2014).

The parties quibble about whether Nationstar's communications of July 12, 2013, were delivered in one letter with three components or three separate letters. Regardless, the communications of July 12, 2013, gave Laws sufficient notice that any QWR should not be addressed to "Nationstar Mortgage, 350 Highland Drive, Lewisville, TX 75067, Attn: Payoff Processing." Rather, in the July 12, 2013 communication Nationstar notified Laws of a specific office address to send QWRs, "Nationstar Mortgage, 350 Highland Drive, Lewisville, TX 75067, Attn: Customer Relations Officer."

Laws sent the August 16, 2013 letter to "Nationstar Mortgage, LLC[,] 350 Highland Drive[,] Louisville [sic], TX 75607[,] ATTN: Payoff Processing." Nationstar's communications before August 16, 2013, did not tell Laws to send QWRs to "Payoff Processing," although Nationstar's

21

letter dated August 22, 2013, directed Laws to send payments, if by mail, to that address. Although the street addresses were the same, Regulation X allows a loan servicer to set a specific office, not merely an address, as the servicer's sole address for QWRs. Therefore, any QWR sent to "Payoff Processing" did not trigger Nationstar's responsibilities under section 2605(e).

Next, the court addresses the May 19, 2014 letter. First, Nationstar argues that Laws's complaint does not allege that the May 19, 2014 letter was a QWR, and that Laws may not proceed with a claim for a RESPA violation based on the May 19, 2014 letter. [D.E. 39] 13 n.7, 17. Laws, however, sufficiently identified the May 19, 2014 letter as a basis for Laws's RESPA claim in his amended complaint. See Am. Compl. ¶¶ 47, 105. Thus, the court rejects that argument.

Nationstar also argues that its response to the May 19, 2014 letter was sufficient under RESPA. The May 19, 2014 letter referred Nationstar to Laws's August 16, 2013 letter. [D.E. 37-6] 43. The letter itself stated no specific reason for Laws's objection except that Laws denied having "not properly paid his mortgage." Id. The August 16, 2013 letter, however, did state that the information that Laws had missed payments when BANA was the loan's servicer was false. Id. at 24–25. On May 29, 2014, Nationstar responded that it had "conducted an investigation, and . . . determined the error asserted within your correspondence did not occur on the account. The payment history appears to be reported accurately . . . ." Id. at 45. Nationstar's response purported to attach a "Transaction History Report," although that report is not in the record. See id. The relevant question, however, is whether Nationstar actually conducted an investigation. Here, a reasonable jury would have a sufficient evidentiary basis to find that Nationstar conducted no investigation.

As for Nationstar's argument that Laws suffered no actual damages as a result of its alleged RESPA violation, a reasonable jury would have a legally sufficient basis to find that, had Nationstar conducted an investigation, it would have discovered that Laws was not in default. It is not

22

Nationstar's failure to respond, but its failure to perform any investigation that could be the source of damages. A jury would have a legally sufficient basis to find that, had Nationstar conducted an investigation, it would have discovered that Laws was not in default on the Note. In that case, Nationstar would have been legally required to report Laws's credit information to credit reporting agencies, and Nationstar does not argue that a plaintiff cannot recover for credit damage under RESPA.

Finally, the court addresses the September 25, 2014 letter. Laws did not allege in his amended complaint that the September 25, 2014 letter was a QWR. Moreover, Laws may not amend his complaint via summary-judgment briefing. See, e.g., Hexion Specialty Chems., Inc., 2011 WL 4527382, at *7–10 (collecting cases). Therefore, Nationstar's motion for summary judgment is granted as to Laws's claims of a RESPA violation based on the August 16, 2013 letter and the September 25, 2014 letter, and denied as to Laws's claim of a RESPA violation based on the May 19, 2014 letter.

### D.

As for Laws's FDCPA claims, Laws alleges that Nationstar: (1) caused a phone to ring with intent to harass in violation of 15 U.S.C. § 1692d(5); (2) contacted Laws after being informed that Laws was represented by an attorney in violation of 15 U.S.C. § 1692c(a); (3) assessed charges, interest, fees, or expenses that were not expressly agreed upon or permitted by law in violation of 15 U.S.C. § 1692f(1); and, (4) failed to cease collection efforts pending the investigation of a disputed debt in violation of 15 U.S.C. § 1692g(b).[8]

---

[8] To the extent Laws seeks to assert an FDCPA claim against U.S. Bank, the court grants summary judgment to U.S. Bank. No evidence supports such a claim against U.S. Bank.

Section 1692d(5) prohibits a debt collector from "[c]ausing a telephone to ring . . . repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." Whether a debt collector's conduct was harassment "is a fact-intensive issue" that "turns on evidence regarding the volume, frequency, pattern, or substance of the phone calls." Kuntz v. Rodenburg LLP, 838 F.3d 923, 926 (8th Cir. 2016).

Section 1692c(a) prohibits a debt collector from contacting a consumer without the consumer's prior consent "in connection with the collection of any debt . . . if the debt collector knows the consumer is represented by an attorney with respect to such debt." Whether a communication was "in connection with the collection of [a] debt" is determined according to (1) the presence or absence of a demand for payment, (2) the parties' relationship, and (3) "the objective purpose and context of the communication." Olson v. Midland Funding, LLC, 578 F. App'x 248, 251 (4th Cir. 2014) (per curiam) (unpublished) (alteration and quotation omitted).

Section 1692f(1) prohibits a debt collector from collecting "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." Under section 1692g(b), if a "consumer notifies [a] debt collector in writing within the thirty-day period" after a debt collector's initial communication "that the debt, or any portion thereof, is disputed," that debt collector may not try to collect the debt until the debt collector has sent certain information regarding the validity of the debt to the debtor.

Under the bona fide error defense, a debt collector may avoid liability under the FDCPA if the debt collector can show, by a preponderance of the evidence, that: (1) its violation of the FDCPA was unintentional; (2) the violation resulted from a "bona fide error"; and, (3) the debt collector maintained "procedures reasonably adapted to avoid any such error." 15 U.S.C. §

1692k(c); see Russell v. Absolute Collection Servs., Inc., 763 F.3d 385, 389 (4th Cir. 2014).

### 1.

As for Laws's claim that Nationstar caused a phone to ring with intent to harass, a reasonable jury could find that Nationstar caused Laws's phone to ring with intent to harass him. Although Nationstar was permitted under the Note to inspect the property where Laws lived, the manner and circumstances surrounding Nationstar's repeated attempts to inspect the property, which caused the security guard to call Laws and ask if the inspectors could enter, create a factual question as to whether Nationstar caused Laws's telephone to ring repeatedly with intent to annoy, abuse, or harass Laws.

In opposition, Nationstar argues that it did not violate this provision because Nationstar itself did not make any phone calls. Section 1692d(5) does not require that the debt collector itself make the phone call, merely that it cause a telephone to ring. A reasonable jury would have a legally sufficient basis to find that Nationstar caused Laws's phone to ring repeatedly with intent to harass Laws based on the number of attempted inspections, including multiple attempts to inspect on the same day, the absence of evidence suggesting Nationstar attempted to obtain permission to enter the gated community other than by arriving at the community unannounced, and Nationstar's attempts to inspect the property frequently, soon after successful inspections.

### 2.

As for Laws's claim that Nationstar contacted Laws personally after being notified that he was represented by counsel, Laws's attorney notified Nationstar in a letter dated August 16, 2013, that he would be representing Laws and directed all communication to be sent through the attorney's office. On June 20, 2014, Nationstar sent a letter addressed to Laws. [D.E. 37-6] 51–56. Nationstar does not contest that this letter was sent to Laws, but rather claims any FDCPA violation was

excused based on the bona fide error doctrine. [D.E. 39] 28–29. Nationstar argues that any violation of section 1692d(5) was the result of a bona fide error because Nationstar changed Laws's mailing address in its internal record system and because only one letter was sent to the wrong address. Nationstar does not, however, cite any evidence that Nationstar uses any particular procedure to ensure these errors do not occur. Therefore, the court denies Nationstar's motion for summary judgment on this affirmative defense.

3.

As for Laws's claim that Nationstar assessed fees and charges that were not authorized under the Note, Nationstar contends that it properly assessed fees and that, in the alternative, the fees were the result of a bona fide error regarding the debt. As for Nationstar's contention that it properly calculated the amount Laws owed, a reasonable jury would have a legally sufficient basis to find that Laws did not owe those charges. As for Nationstar's contention that any disputed amounts were based on a bona fide dispute, it cites McLean v. Ray, 488 F. App'x 677 (4th Cir. 2012) (unpublished), which upheld a district court's grant of summary judgment to a defendant debt collector where the defendant made a bona fide mistake based upon a predecessor's statement of the amount of a debt. In that case, the debt collector had received statements from the predecessor stating the amount owed. Id. at 683. Here, Nationstar has not cited any evidence showing that Nationstar received any statement of Laws's account from BANA, and the record contains only a statement of account sent from BANA to Laws before Nationstar began servicing the account. Therefore, the court denies Nationstar's motion for summary judgment on this affirmative defense.

4.

As for Laws's claim that Nationstar violated section 1692g(b), Laws argues that, although Nationstar responded to Laws's dispute letter, Nationstar's responses were not sufficient under

26

section 1692g because they inconsistently stated the owner of the loan. [D.E. 45] 26–27. Laws did not include this theory in his amended complaint. See Am. Compl. ¶ 87(e). Laws may not amend his complaint via summary-judgment briefing. See, e.g., Hexion Specialty Chems., Inc., 2011 WL 4527382, at *7–10 (collecting cases). Thus, that claim fails.

III.

In sum, defendants' motion for summary judgment [D.E. 36] is GRANTED in part and DENIED in part. U.S. Bank is DISMISSED as a defendant. Nationstar and Laws shall conduct a mediation with United States Magistrate Judge Jones. Judge Jones will issue an order concerning the mediation process.

SO ORDERED. This 11 day of July 2017.

JAMES C. DEVER III
Chief United States District Judge